**RECEIVED**

MAR 2 6 2007

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

BARBARA NED

VERSUS

OPELOUSAS GENERAL HOSPITAL

CIVIL ACTION NO.: 04-1536

JUDGE DOHERTY

MAGISTRATE JUDGE METHVIN

## MEMORANDUM RULING

Currently pending before the Court is a Motion for Summary Judgement [Doc. 16] filed on behalf of defendant, Opelousas General Hospital ("the Hospital"), wherein defendant seeks dismissal with prejudice of all claims brought against it by plaintiff. For the following reasons, the motion is GRANTED.

## I. PROCEDURAL HISTORY

Plaintiff, Barbara Ned, filed the instant law suit on July 23, 2004 against Opelousas General Hospital asserting claims for: (1) unlawful discrimination on the basis of race and sex in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2002e et seq.; (2) unlawful discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621; (3) unlawful discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq.; (4) unlawful discrimination on the basis of race, sex, disability and age in violation of the Louisiana Employment Discrimination Law ("LADL"), La. R.S. 23:301 et seq., and in violation of La. R.S. 51:2231 et seq.[1], and (5) discrimination in violation of 42 U.S.C.

---

[1] Plaintiff's Complaint cites La. R.S. 23:331, a version of the LADL repealed in 1997, and re-codified at La. R.S. 23:301. La.R.S. 51:2231 et seq. was enacted to empower the Louisiana Commission on Human Rights to enforce federal anti-discrimination laws. The Court notes neither party has addressed claims other than those brought under Title VII, the ADEA and the ADA. However, claims asserted under the Louisiana Employment Discrimination Act and La. R.S. 51:2231 are analyzed under the same framework and precedent as Title VII, ADEA and ADA claims, and thus, will be addressed in

§ 1981.[2]  Plaintiff also asserted claims for violation of the Family Medical Leave Act of 1993, 29

U.S.C. § 2601, et seq.; a claim for retaliation by her employer in violation of Title VII, §1981, and

La.R.S. 23:301; and a claim for defamation under Louisiana tort law.  However, plaintiff stipulates

in her opposition to defendant's Motion for Summary Judgment these claims should be dismissed.

[Doc. 22, p. 1]  The Court thus DISMISSES any and all claims asserted by plaintiff for violations

of the Family and Medical Leave Act, unlawful retaliation and defamation.

Specifically, plaintiff alleges after more than thirty years of employment with Opelousas

General Hospital, her supervisory position was eliminated, and "instead of being offered a chance

to do the same work she had been doing for many years or being given a similar administrative job,

she was demoted to a position requiring her to do floor work," which she alleges she was unable to

do. [Doc. 1, ¶ 5] Plaintiff further alleges "[i]n order to force her into retirement at an earlier age,

[she] was denied reasonable accommodation and given the option to retire or be fired for failing to

---

conjunction with plaintiff's federal claims. See e.g. King v. Phelps Dunbar, 743 So.2d 181, 187 (La. 1999); Young v. 7-11, Inc., 2006 WL 346377 (5th Cir. 2006);  Oscar Mayer & Co. v. Evans, 441 U.S. 750, 756 (1979)(claims brought under the ADEA should be construed consistently with claims brought under Title VII); LaDay v. Catalyst Technology, Inc., 302 F.3d 474, 477 (5th Cir. 2002) (because Title VII and the Louisiana Anti-discrimination Law are substantially similar, the outcome will be the same under the federal and state statutes and the issues are properly analyzed under the applicable federal precedence); O-Boyle v. Louisiana Tech University, 741 So.2d 1289 (La. App. 2nd Cir. 1999), and Taylor v. Oakbourne Country Club, 846 So.2d 959 (La. 3rd Cir. 2003) (claims brought under the Louisiana equivalent of the ADA are analyzed using federal precedent);  Labit v. Akzo-Nobel Fault, Inc., 209 F.3d 719, n. 1 (5th Cir. 2000) ("Louisiana courts apply federal jurisprudence to assess discrimination claims under La. R.S. 23:301 et seq.; thus, we will consider the claims simultaneously."); Galbreth v. Bell South Telecommunications, Inc., 896 F. Supp. 631, 633 (E.D. La. 1995); Spears v. Roundtree Oldsmobile-Cadillac Co., 653 So.2d 182 (La. Ct. App. 2nd Cir. 1995).

[2] 42 U.S.C. § 1981 grants all persons within the jurisdiction of the United States equal rights to "make and enforce contracts," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Neither party has addressed claims brought pursuant to § 1981. However, the Court notes employment discrimination claims brought under 42 U.S.C. §1981 are analyzed under the evidentiary framework applicable to claims arising under Title VII. Lawrence v. University of Texas Medical Branch at Galveston, 163 F.3d 309, 311 (5th Cir. 1999).  As such, plaintiff's claims brought pursuant to §1981 will be addressed in conjunction with her Title VII, ADEA and ADA claims.

perform work that she was physically unable to perform." [Doc. 1, ¶ 5]. In other words, plaintiff asserts she was constructively discharged.[3]

## II. STATEMENT OF FACTS

### A. Background

Plaintiff was hired by the Hospital on November 11, 1970 to work in its respiratory therapy department as an "Inhalation Aide." All parties agree plaintiff enjoyed successful, long-term employment with the Hospital and was well thought of by the administration and other employees. During her career, plaintiff was first promoted in 1981 from "Inhalation Aide" to "Respiratory Therapist," and again in 1997 from "Respiratory Therapist" to "Assistant Director of Respiratory Therapy." Plaintiff continued to work in the respiratory therapy department until her resignation in 2003. Plaintiff states she did her job in an exceptional manner and was named employee of the month in April of 1998 and employee of the year in May of 1998. [Plaintiff's Exh. 2]

Plaintiff states she was responsible for the supervision of correspondence students from California College who performed their clinical work at the Hospital, authored manuals for the respiratory therapy department and authored the productivity improvement plan the new administration intended to use hospital wide.[4] Plaintiff testified she was essential to the running of the respiratory therapy department and during times when the department was without an official director, she acted as interim director, performing many duties of a director. [Ned depo., pp. 37-38;

---

[3] The Parties appear to agree plaintiff's claims, under all statutes relied upon, are for constructive discharge; no other type of discrimination claims have been argued by either side in the briefing submitted for the purposes of this motion.

[4] The third fact listed above is disputed by defendant, who cites Ms. Ned's deposition, p. 52, in support. Page 52 has not been provided to the Court.

-3-

Doc. 22, p. 3] During much of her employment, plaintiff reported to Michael Mullins[5], Director of Respiratory Therapy, and Bob Hardy[6], Vice President of Support Services.  Plaintiff states she had a good working relationship with both Mr. Mullins and Mr. Hardy. [Ned depo., pp. 33-34]

According to Ms. Ned, the turning point in her career occurred in 2002 when the Hospital decided the respiratory therapy department would merge with the department of cardiopulmonary services, and "Cherisse Comeaux, a white female, who was younger than Mrs. Ned, possessed no experience in respiratory therapy management, and with fewer years of experience as a whole, was chosen as director of the new consolidated department." [Doc. 22, p. 4 (citing Comeaux depo., pp. 5-7)][7]

## B. Plaintiff's Protected Class and Alleged Impairments

Ms. Ned is a sixty-three year old African-American female. In 1995, while employed by the Hospital,  plaintiff was diagnosed with breast cancer and underwent a mastectomy.  Plaintiff underwent radiation and chemotherapy in 1996.  Plaintiff alleges as a result of the breast cancer, she has lymphodema (a swelling in her right arm).  Plaintiff agrees the lymphodema did not affect her ability to perform her job duties at the Hospital.  [Statements of Material Facts, ¶ 4]

Plaintiff testified she was diagnosed with cervical disc disease in 2000 and underwent physical therapy at the Hospital from 2000 to 2002. [Ned depo., p. 19] She alleges this condition results in a numbness in all of her fingertips and her left arm, and the condition is becoming progressively worse.  [Id.] Plaintiff also claims this condition limits her ability to do frequent

---

[5] White male, date of birth 9/7/48.

[6] White male, date of birth 6/27/56.

[7] In the cited pages, Ms. Comeaux testified although she had no experience managing respiratory therapy, she has twenty years of experience managing cardiopulmonary services.

pushing or pulling and limits her ability to reach above her head. [Id. at 28]

Plaintiff testified she has diabetes, lumbar pain, cervical pain and arthritis, but does not take medication for these conditions. [Id., pp. 25-26]

Plaintiff further testified her foot hurts after walking for thirty to forty minutes, or if she stands too long. [Id., p. 27]

Plaintiff is able to see, hear, speak, and take care of her personal hygiene. [Id. at 28] Plaintiff does most of her household chores, however she asserts she cannot vacuum or pick up things above her head. [Id., pp. 28, 30] When asked what life activities are affected by her condition, plaintiff testified she cannot hold her grandchildren. [Id., p. 30]

Defendant stipulates "Plaintiff is an African-American female over forty years of age."[8] [Doc. 16, p. 11] Defendant further stipulates, for purposes of this motion only, plaintiff is a qualified individual with a disability. [Id., pp. 11-12]  As such, the Court accepts for purposes of this motion that plaintiff is a member of a protected class based on her race, sex, disability and age.

## C. The Opelousas General Productivity Plan[9]

In May of 2002, Jim Richardson became interim Chief Executive Officer of the Hospital. During his term, management decided the Hospital needed to develop a formal productivity monitoring system, and development of such a plan was "a priority of the Hospital." [Declaration of Hardy, ¶ 7].  The Hospital hired Quorum Consulting, Inc., a national health care consulting company, to develop the productivity plan for the Hospital.  During the week of July 15, 2002, a clinical consultant with Quorum came to the Hospital to meet with department heads and begin

---

[8] The ADEA applies only to individuals who are at least 40 years of age.  29 U.S.C. § 631(a).

[9] Unless stated otherwise, the facts contained in this section (Section II, C) are not in dispute.

establishing productivity labor standards for each department of the Hospital. A productivity software system was put into place. The system creates a productivity index for hospital departments which measures productive labor hours against actual labor expenses. The more involved department employees are in direct patient care and productivity, the better the department's performance will be against the productivity index.

In July 2002, a Board of Director's meeting was held to clearly establish the productivity plan. A presentation was made by the Quorum's clinical consultant regarding the plan and its implementation. At the meeting, Mr. Richardson "announced changes in and consolidation of reporting relationships for certain Hospital departments." [Statement of Undisputed Material Facts, ¶ 8] The stated purpose of the changes was to "gain some efficiency in the labor already on payroll." [Id.] At a hospital department managers' meeting held August 1, 2002, Mr. Richardson again emphasized the need to increase productivity in the departments and further discussed changes in reporting relationships.[10] On August 8, 2002, it was announced at a Department Manager's meeting

---

[10] More specifically, the "General Overview" of that meeting states in pertinent part as follows:

> Mr. Richardson reviewed Standard & Poor's criteria regarding bond ratings. The hospital's bond rate is presently rated BBB, which is within the parameters of adequate protection. The Board has applied to upgrade that rate, as the hospital struggles to regain its financial position. The charity system in Louisiana is collapsing. The hospital's bottom line eroded this last year, but OGH has the capability to restore a healthy margin by controlling labor costs. While labor savings gained by increasing productivity will not be a significant percentage of overall labor costs, that savings could add significantly as a percentage increase in the bottom line. The Managers control the destiny of OGH. One (1%) percent, or sixty (60) hospitals, of the approximately 6,000 hospitals in America close per year. If the profit margins drop, at some point in time our bond rating will also drop. The meetings with Patti Hammond-Moss and Jerry Clements went very well. Thanks to everyone engaged in the process. Jim Richardson. [Doc. 16, Exh. 6]

that the productivity system was ready to be implemented.[11]  A portion of the "general overview of

the August 8, 2002 meeting reads as follows:

> Mr. Richardson would far rather see employees flexed, and will rely on the Managers
> to do this.  Should a Manager feel that the only way to achieve standards within a
> department is by deleting a position or by laying off an individual, that issue should
> be discussed with Bob [Hardy].  Administration has given no directive for any
> layoffs, but Administration recognizes that within a particular work unit a layoff
> might be required as determined by the unit Manager.  To insure the work is done,
> a particular unit may need to be somewhat re-organized.  Some departments are
> already experiencing normal turnovers, which facilitates this change and some units
> have already resolved their problems....

[Doc. 16, Exh. 7]

On November 1, 2002, William "Bud" Barrow[12] took over as Chief Executive Officer.  Mr.

Barrow testified upon his arrival, the Hospital was losing money in operations and underperforming.

[Barrow depo., p. 9]  He testified an expense reduction plan had begun before his arrival and needed

to continue. [Id., pp. 15-16]  Mr. Barrow relied on Mr. Hardy to ensure the productivity plan was

being implemented. [Id.][13]

Mr. Barrow testified in the respiratory therapy department, there was a need to put more

employees at the bedside, and there was a duplication of management resources. [Id., p. 19] As part

of the productivity plan, it was decided the Hospital did not need both a director of respiratory

---

[11] To whom this "announcement" was made is unclear to the Court.  However, the exhibits cited
in support contain "a general overview" of a Department Manager's meeting held August 8, 2002 which
directs management to "brief their employees on the content of this overview, or post it on their bulletin
boards." [Def. Ex. 7]

[12] White male, date of birth 4/26/54.

[13] The Court notes further review of Mr. Barrow's deposition shows he testified as follows:

Cherisse Comeaux has the primary responsibility for respiratory therapy at Opelousas
General today.  She worked under Bob Hardy, who is the vice president reporting to me; and
they have the responsibility to make sure that their employee costs and other expense costs,
such as supplies, are in line with our patients that we serve.

therapy and a director of cardiopulmonary services, as the departments are closely related in function. [Id., p. 17].  After Mr. Hardy conducted an evaluation, he recommended to Mr. Barrow the management positions in respiratory therapy and cardiopulmonary be combined for efficiency purposes.  The Hospital determined Michael Mullins' position of Director of Respiratory Therapy would be eliminated, and Cherisse Comeaux would take over the respiratory therapy department in addition to cardiopulmonary services.[14]

## D. Defendant's Version of Subsequent Events

Defendant contends Mr. Barrow and Mr. Hardy had conversations about requiring more employees to perform patient care. [Doc. 16, p. 5] In furtherance of the productivity plan, Mr. Hardy also conferred with Ms. Comeaux, and it was decided plaintiff would be required "to begin performing more direct patient care functions consistent with her job description as assistant director of respiratory therapy."[15]   [Defendant's Exh. 1, ¶ 14] According to Mr. Hardy, at the meeting between Ms. Comeaux and him, it was agreed:

> Ms. Ned's Assistant Director of Respiratory Therapy position would be maintained, as Comeaux had no experience in respiratory therapy, and Comeaux would need to rely on Ms. Ned to help manage the respiratory functions and employees.  However, we did agree that Comeaux should speak with Plaintiff to discuss getting her more involved in patient care duties to assist with the productivity index.  At no time did

---

[14] Mr. Mullins was offered a patient care position in respiratory therapy which he declined. [Statement of Undisputed Facts, ¶ 15]  Mr. Mullins' employment was terminated November 2002. [Id.]

[15] Plaintiff does not dispute she was told she would have to perform certain patient care and floor duties, nor does she dispute that such duties were consistent with the job description of Assistant Directory of Respiratory Therapy. [Plaintiff's Statement of Facts, ¶ 16] Plaintiff does however dispute the decision to require her to do more direct patient care was made solely in furtherance of the productivity plan.  She contends Ms. Comeaux knew she was physically incapable of performing the new duties, and assigning plaintiff new duties was "part of an effort to force her to retire." [Doc. 22-1, ¶ 16]

I authorize Comeaux or anyone else at the Hospital to remove Ms. Ned from her position, lay her off, or otherwise demote her." [Declaration of Hardy, ¶¶ 14 and 15][16]

On December 6, 2002, after Mr. Mullins was removed from his position, Ms. Comeaux met with plaintiff for an initial meeting to discuss the status of the department.[17] [Doc. 16, p. 5] No one else was present at the meeting. Defendant states because Ms. Comeaux was not a respiratory therapist and had not previously managed the respiratory therapy department, she "needed plaintiff as a resource for managing the department." [Id.] Ms. Comeaux and the Hospital describe the meeting as an effort "to brainstorm with plaintiff, collect information, and determine a future strategy for the department," as well as a discussion about "various job duties in the department." [Id., pp. 5-6; Comeaux depo., pp. 15-16] According to defendant, Ms. Comeaux initiated a discussion "about plaintiff handling more patient care duties in keeping with the productivity plan." [Id., p. 6]

At the meeting, Ms. Comeaux "reviewed with plaintiff the job description, which contains patient care duties as essential functions of the position, to find out what plaintiff could do." [Id., pp. 15-16] Ms. Comeaux testified Ms. Ned told her at the meeting there were certain physical functions Ms. Ned could not perform. Ms. Comeaux specifically recalled plaintiff stating she was unable to "reach overhead."[18] [Comeaux depo., pp. 31-32] No pay or benefits were discussed at the meeting.[19]

---

[16] Plaintiff disputes defendant's contentions that her position was to be retained and she was to remain Assistant Director. She asserts she was told by Cherisse Comeaux that her position had been eliminated, and she had two options: work the new schedule or retire. [Plaintiff's Response to Defendant's Statement of Undisputed Facts, ¶¶ 17 & 18]

[17] Plaintiff points out that a few weeks before meeting with Ms. Comeaux, she received her yearly evaluation for 2002 and was given scores high enough for a pay raise. [Exh. 7]

[18] Defendant points out plaintiff admitted that prior to Ms. Comeaux becoming director, she did perform patient care duties. [Doc. 16, p. 6] Defendant notes that although plaintiff testified she could not reach above her shoulders or push and pull frequently, plaintiff also testified she could perform the following patient care duties: oxygen therapy, respiratory treatments, EKG administration, maintenance of ventilators, pulmonary function studies and diagnostic procedures; many of these functions required plaintiff to be on the floor and work with patients. [Ned depo., pp. 41-42, 44] A review of pp. 38-43 of

Following the meeting with Ms. Comeaux on December 6, 2002, plaintiff left the Hospital and never returned to work.[20]  The day after the meeting, plaintiff went to see a doctor due to an ingrown toenail.[21]  Plaintiff testified as a result of the ingrown toenail and because she is diabetic, she "stayed home and tried to heal [her]self." [Plaintiff's depo., p. 60] Approximately, three weeks later, Ms. Comeaux telephoned plaintiff to inquire if she would be returning to work. [Id., pp. 66-67] Ms. Comeaux told plaintiff she needed her knowledge of the respiratory therapy department.[22]  [Id., p. 67]  Plaintiff testified she told Ms. Comeaux she was not coming back to work, as she could not "physically work the floor." [Id., p. 67]

In December 2002, after the meeting with Ms. Comeaux, plaintiff went to meet with Suzanne Kidder, Director of Human Resources, to obtain information about retirement.  Plaintiff did not lodge any complaint or otherwise mention to Ms. Kidder her meeting with Ms. Comeaux.[23] The same month, plaintiff submitted an application for long-term disability benefits. [Ned depo., p. 116] Defendant argues the above actions clearly show plaintiff had no intention of returning to work. [Doc. 16, p. 7]

---

Ms. Ned's deposition shows Ms. Ned testified the hospital was understaffed on Thursdays and Fridays, and she performed patient care duties on Thursdays "with the morning rounds, or any other time of day when there was a need that couldn't be met by another staff person." [Id., pp. 42-3]

[19] Plaintiff does not dispute this statement. [Doc. 22, p. 13]

[20] Plaintiff does not dispute this statement. [Doc. 22-1, ¶26]

[21] Plaintiff does not dispute this statement. [Doc. 22-1, ¶27]

[22] Plaintiff admits this statement was made but disputes the manner in which it was made.

[23] The third step of the Hospital's grievance procedure is to present the grievance in writing on a special form provided for grievances ("Grievance Report") to the Director of Human Resources. [Defense Exh. 20] Of further interest to the Court, Mr. Hardy testified plaintiff never complained to him about her meeting with Ms. Comeaux. (The second step of the Hospital's grievance procedure is to lodge the grievance with the appropriate administrative staff member, which, in this instance, appears to be Mr. Hardy. [Defense Exhs. 1 and 20])

### E. Plaintiff's Version of Subsequent Events

Plaintiff contends at the December meeting Ms. Comeaux informed plaintiff her position as Assistant Director of Respiratory Therapy had been "terminated," and that she was "no longer needed" as Assistant Director. [Ned depo., p. 57] She states Ms. Comeaux informed her her new job title would be Respiratory Therapist. [Id., p. 66]   Plaintiff states Ms. Comeaux presented her with a new work schedule that required plaintiff to work "ten hour days", something she knew she was physically incapable of doing. [Id., p. 58]  Plaintiff testified when she informed Ms. Comeaux she could not perform this new work schedule, Ms. Comeaux told her her other choice was to retire. [Id. p. 58]  Plaintiff denies Ms. Comeaux reviewed the job description for Assistant Director of Respiratory Therapy with her at the December meeting. [Id., p. 68]  Plaintiff states she was crying when she left the meeting, and at no time during the meeting did Ms. Comeaux express a desire that plaintiff remain in the respiratory therapy department. [Id., pp. 68-69]  Plaintiff testified she never returned to work following the December meeting because Ms. Comeaux told her her "computer would be turned off so [she] wouldn't do payroll anymore," and Ms. Comeaux said she wanted the "keys to the file cabinet and all of [her] manuals."[24]  [Id., p. 60]

---

[24] Ms. Comeaux denies telling plaintiff her choice was to either work under the new schedule or retire. Ms. Comeaux denies ever mentioning the words "resign" or "retire" at the meeting, and further denies she ever gave plaintiff an ultimatum at the meeting. [Comeaux depo., pp. 18, 27] Ms. Comeaux testified she opened the meeting with "Barbara, what can we do with respiratory therapy to assure that we have everybody doing direct patient care?" She states, "Our idea was to talk about how are we going to manage this. This is a severe change." [Id., p. 10] Ms. Comeaux testified although the goal of the meeting was to find out what was going on in the respiratory department, an outcome she needed to obtain eventually was to get Ms. Ned back to working on the floor. [Id., pp. 12-13] She denies ever telling Ms. Ned during that meeting she had to work on the floor. [Id., p. 15] She testified she did tell Ms. Ned the Hospital was "getting in a system that was going to mandate productivity being held to its standard." [Id., p. 15] Ms. Comeaux denies anything said during the meeting could potentially have been construed as an ultimatum. [Id.]

Plaintiff alleges Ms. Comeaux's intention at the meeting:

> [W]as to "use" plaintiff to find out how to manage the respiratory therapy department, and then effectively force her out of her managerial position, and back into working on the floor, something Mrs. Ned was not physically capable of doing. This explains why the meeting was never finished and why Mrs. Ned would have left the meeting in tears. Mrs. Ned was being forced out of her job.

[Doc. 22, p. 9] According to plaintiff, "The new job duties she claims were presented to her at the meeting can be considered a demotion," and her new schedule, coupled with the removal of her managerial duties and replacement with floor and direct patient care duties, "could certainly qualify as a demotion." [Id., p. 12]

**F.  Undisputed Facts**

Plaintiff met with Bud Barrow on December 17, 2002 for approximately one hour.  During the meeting, plaintiff stated she wanted to retire because she felt she could no longer work in respiratory therapy providing patient care.  Plaintiff told Mr. Barrow she had originally wanted to retire on April 15, 2003, her sixtieth birthday, but now felt January 15, 2003 was more appropriate, and she would apply for long-term disability benefits.   Mr. Barrow asked plaintiff on multiple occasions if she would consider continuing to work for the Hospital, with the option of working in an alternate position.   Mr. Barrow offered a possible transition into a customer service/patient relations position.   Mr. Barrow asked plaintiff if she was sure she wanted to retire without at least considering other work opportunities.  Plaintiff "was adamant about saying she did not have the health to continue to work, and she wanted to retire." [Statement of Undisputed Facts, ¶33][25]

---

[25] When asked why she turned down the offer of alternative employment, plaintiff testified "I was a respiratory therapist.  I didn't know anything about public relations and all I could go and do is be a gofler [sic].  And my legs and my feet weren't going to hold up under coming and going from the Hospital." [Ned depo., p. 78]  Plaintiff admits in her deposition her description of the alternate position was all presumption on her part. [Ned depo., p. 78]

On December 18, 2002, plaintiff submitted her resignation letter.  On December 19, 2002, Mr. Barrow wrote plaintiff a letter expressing his "sincere appreciation" for plaintiff's "long and successful career" with the Hospital. [Defendant's Exh. 12] He further told plaintiff:

> [U]ltimately your decision to retire or not is solely in your hands.  Should you wish to continue working at OGH until April 15, 2003, I believe you can add a lot of value and service in working with Judy Theall.  However, I understand the opportunities that exist by retiring in January and by an application for disability payments.  Be assured that all of us at OGH will do whatever is possible in this transition.

Further, Mr. Barrow noted in the letter he wanted to have a special celebration for plaintiff's retirement and asked her to consider volunteering at the hospital.

The day before plaintiff's retirement celebration, Mr. Barrow telephoned plaintiff and again asked her if she had reconsidered retirement. When plaintiff declined to reconsider returning to work, Mr. Barrow told her he was sorry she felt that way.  When asked during her deposition why she did not consider going back to work in another position after Mr. Barrow's telephone call, plaintiff testified, "That was not what I was trained to do." [Plaintiff's depo., p. 91]

As previously stated, plaintiff's last day of work was December 6, 2002 (the day of her meeting with Ms. Comeaux).  Plaintiff submitted her resignation letter on December 18, 2002. The Hospital permitted plaintiff to use accrued sick time "to bridge payment from her last day until her January 15, 2003 retirement date." [Statement of Undisputed Facts, ¶37]  The Hospital also gave plaintiff a $1,000 retirement bonus and a retirement party.

Following plaintiff's retirement, Ms. Comeaux assumed many of plaintiff's duties, and some were assigned to other employees.[26]  Approximately ten months after plaintiff left her employment

---

[26] Defendant asserts Ms. Comeaux continues to perform many of plaintiff's duties to this day.

with the Hospital, it was decided by the department that Lynn O'Connor[27] would be placed in the position of "Chief Registered Respiratory Therapist." Ms. O'Connor performs active patient care functions as part of her duties.

## G. Disputed Facts

According to defendant, no one was hired as the Assistant Director of Respiratory Therapy after plaintiff left, and Patricia Dartez, Assistant Director of Cardiopulmonary Services, is the only assistant director who has worked under Ms. Comeaux since plaintiff's retirement.  Plaintiff argues she was replaced by Lynn O'Connor, whose job title is "Chief Registered Respiratory Therapist." Defendant argues the positions of Assistant Director of Respiratory Therapy and Chief Registered Respiratory Therapist are different in that: (a) "O'Connor performs active patient care functions;" (b) "the chief registered respiratory therapist is not an assistant director position, and is not second in command in the department;" and (c) the position of chief registered respiratory therapist has less responsibilities than plaintiff's former position as Assistant Director of Respiratory Therapy. Plaintiff disputes defendant's statement that "the position of Chief Registered Respiratory Therapist entails less responsibility than her former position, as the job descriptions are virtually identical." [Doc. 22-1, ¶ 41]  Plaintiff further asserts neither of the other two assistant directors at the Hospital (both males) whose departments underwent administrative changes have "separated" from their employment at Opelousas General Hospital.  In response to this allegation, defendant extensively argues the two assistant directors who remained employed with the Hospital were not similarly situated to plaintiff.

---

[27] White female, non-disabled, date of birth not provided, however, according to Mr. Mullins' affidavit Comeaux was approximately forty in 2002 [Doc. 22, Exh. 2]

### III.  LAW AND ANALYSIS

**A.  Summary Judgment**

Summary judgement is appropriate where the facts and law as represented in the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show there is no genuine issue as to any material fact and the moving party is entitled to a judgment

as a matter of law.  Fed. R. Civ. Proc. 56(c).  A fact is material if it could affect the outcome of the

case under the governing law.  Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A dispute

about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Id. at 248.

The party seeking summary judgment bears the initial burden of demonstrating that there is

an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 47 U.S.

317, 325 (1986).  Only after a proper motion for summary judgment is made must the non-movant

set forth specific facts showing there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).

As the Fifth Circuit has pointed out:

> This burden is not satisfied with 'some metaphysical doubt as to the material facts,'
> by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla'
> of evidence.  We resolve factual controversies in favor of the nonmoving party, but
> only when there is an actual controversy, that is, when both parties have submitted
> evidence of contradictory facts.  *We do not, however, in the absence of any proof,*
> *assume that the nonmoving party could or would prove the necessary facts.*
> ...[S]ummary judgment is appropriate in *any* case "where critical evidence is so weak
> or tenuous on an essential fact that it could not support a judgment in favor of the
> nonmovant."  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (*en*
> *banc*)(citations omitted)(emphasis in original).

In evaluating the evidence provided in support of, and in opposition to, a Motion for

Summary Judgment, "[t]he court must view facts and inferences in the light most favorable to the

party opposing the motion."  Hunt v. Rapides Healthcare Sys. LLC, 277 F.3d 757, 762 (5th Cir.

2001). "A factual dispute precludes a grant of summary judgment if the evidence would permit a reasonable jury to return a verdict for the non-moving party." Id. In evaluating evidence to determine whether a factual dispute exists, "[c]redibility determinations are not part of the summary judgment analysis." Id. To the contrary, "[i]n reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the non-moving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." Roberts v. Cardinal Servs., 266 F.3d 368, 373 (5th Cir. 2001).

**B. Claims of Race and Sex Discrimination in violation of Title VII, 42 U.S.C. § 1981, La. R.S. 23:301, and La. R.S. 51:2231**

Title VII of the Civil Rights Act of 1964 forbids employment discrimination against any individual based on the individual's race, color, religion, sex or national origin. Burlington Northern & Santa Fe Railway Co., v White, 126 S.Ct. 2405, 2408 (2006)(internal quotations omitted). Title VII provides in pertinent part, "It shall be an unlawful employment practice for an employer...to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, or national origin... ." 42 U.S.C. § 2000e-2. "A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence. Absent direct evidence of discriminatory intent, as is typically the case, proof via circumstantial evidence is assembled using the framework set forth in the seminal case of McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973)." Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000.)[28]

---

[28] Plaintiff admits this matter should be analyzed under the circumstantial evidence framework set forth above, rather than the direct evidence framework. [Doc. 22, p. 10] The Court agrees. (For cases using the direct evidence framework, see e.g., Fabela v. Socorro Ind. School Dist.., 329 F.3d 409 (5th Cir. 2003)).

In a matter involving proof via circumstantial evidence, a plaintiff must first establish a prima facie case of unlawful racial discrimination in violation of Title VII. Id.  In order to do so, plaintiff must show: (1) he was a member of a protected class; (2) he was qualified for his position; (3) he was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, shows others similarly situated were treated more favorably. Okoye v. University of Texas Houston Health Science Center, 245 F.3d 507, 512 (5th Cir. 2001).

When an employee resigns (as did Ms. Ned), he may satisfy the adverse employment action requirement by proving "constructive discharge." Barrow v. New Orleans S.S. Ass'n., 10 F.3d 292, 297 (5th Cir. 1994).  As described by the Fifth Circuit:

> [C]onstructive discharge occurs only 'when the employer *deliberately* makes an employee's working conditions so intolerable that the employee is *forced* into an involuntary resignation... . [T]he issue is whether a *reasonable* person in the employee's position and circumstances would have felt compelled to resign.' Wilkins v. Univ. of Houston, 654 F.2d 388, 390 (5th Cir. 1981) (quoting Pitman v. Hattisburg Municipal School District, 644 F.2d 1071, 1077 (5th cir. 1981) (emphasis in original)).  As the Eleventh Circuit recently put it, '[P]art of an employee's obligation to be *reasonable* is an obligation not to assume the worst, and not to jump to conclusions too fast.' Garner v. Wal-mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987).

Dornhecker v. Malibu Grand Prix Corp., 828 F.2d 307, 310 (5th Cir. 1987).  Stated more simply, plaintiff's resignation must have been reasonable under all circumstances. Barrow at 297.  Whether a reasonable employee would feel compelled to resign is a fact specific inquiry, but the Fifth Circuit considers the following factors relevant, singly or in combination:  (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger (or less experienced/qualified) supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or

(7) offers of early retirement on terms that would make the employee worse off whether the offer was

accepted or not.  Keelan v. Majesco Software, Inc., 407 F.3d 332, 342 (5th Cir. 2005).

 The first element of plaintiff's prima facie burden is not in dispute.  The second element is

not addressed by defendant, and thus this Court presumes it is undisputed plaintiff was qualified for

her position.  In support of the third element of plaintiff's prima facie burden (adverse employment

action by way of constructive discharge) plaintiff argues:

> [T]he new job duties she claims were presented to her at the meeting [between
> plaintiff and Ms. Comeaux] can be considered a demotion.  By Ms. Ned's account,
> the new work schedule that involved ten hour days was presented to her.  This new
> schedule, coupled with Ms. Comeaux's removal of her managerial duties, and
> replacement with floor and direct patient care duties could certainly qualify as a
> demotion that would satisfy requirement of the employee suffering an adverse
> employment action.  [Doc. 22, p. 12]

Additionally, plaintiff claims she was presented with a physically demanding work schedule

requiring her to perform floor duties, her new job title would be Respiratory Therapist; her new job

duties were a "clear demotion from her position as a Manager, and one that she was not capable of

handling, given her medical limitations"; her only other choice was retirement; her job

responsibilities were reduced; she was reassigned from managerial work to floor duties and direct

patient care, "which could certainly be considered menial tasks for a former manager"; and she was

reassigned to work under Cherisse Comeaux, a supervisor who was younger and had no experience

in respiratory therapy management. Id. at 13.  Plaintiff argues these circumstances as a whole "could

certainly lead even a reasonable employee in Ms. Ned's position to feel compelled to resign." Id.,

p. 14.

 In response, defendant argues a claim of constructive discharge mandates an employee act

reasonably and "not assume the worst" or "jump to conclusions too fast."  As plaintiff is guilty of

violating these mandates, her resignation was unreasonable. Specifically, defendant argues plaintiff

did not remain on the job while seeking redress and did not engage in any interactive process with

regard to her complaints. [Doc. 16, p. 13] Even accepting Ms. Ned's version of the meeting with

Ms. Comeaux as true, Ms. Ned never returned to work after the meeting to determine what effect,

if any, the meeting would have on her employment. Instead:

> Plaintiff immediately went to the doctor and received a medical excuse for an 'ingrown toenail' and never came back to work. Within a couple of weeks, she admittedly began the process of applying for long term disability benefits. Comeaux called Plaintiff to ask her about returning to work, and Comeaux said she needed Plaintiff's help to manage the respiratory therapy department. Plaintiff declined. Plaintiff... did not complain to the human resources department under the company's EEO policy, or the existing grievance procedure, but rather simply requested information about retirement and disability. She did not call or confer with Hardy about her employment status or conversation with Comeaux. The only person she spoke with was Barrow, who asked her to reconsider her decision to retire and said that if she felt she could not perform the essential functions of her position, Barrow would find alternative work for her. Barrow, also sent her a letter asking her to stay employed. After meeting with her and sending her a letter, Barrow telephoned Plaintiff and yet again asked her to reconsider the decision to retire. She rejected all overtures out of hand.

> ... [A] reasonable employee, instead of immediately ceasing employment, collecting sick pay, working on a disability application, and resigning, would have first pursued several different courses of conduct. The employee could have met again with the supervisor to get a clear understanding of the parameters of the Hospital's expectations and review what patient care duties she admittedly could perform and which she would need assistance with. After all, plaintiff admits she performed 'a lot' of the patient care duties and got assistance for the others. The employee could have consulted with Human Resources, the Vice President of Support Services, or the CEO about working through the issues raised in the meeting with Comeaux. A reasonable employee could have utilized the Hospital's grievance process, could have initiated a complaint with Human Resources, or could have filed a complaint with the Equal Employment Opportunity Commission. Plaintiff pursued none of these. Plaintiff outright rejected the good faith efforts of the Hospital to engage in an interactive process or to work with her to attempt to find suitable employment for her. ... Had she done so, she would have learned that the Hospital was willing to work with her to allow her remain in the position with some modification of duties and increased involvement in patient care.

[Doc. 16, pp. 13-14] Finally, defendant argues plaintiff cannot contend she was demoted due to her meeting with Ms. Comeaux, as "upper management at the Hospital have established that Plaintiff would have remained in the same position at the same rate of pay." [Id., p. 15.]  According to defendant, the only difference in plaintiff's position was that she would be required to be more involved in patient care, "the parameters of which were to be worked out." [Id.]

The Court finds plaintiff has failed to carry her prima facie burden, as the facts before the Court, without more, are insufficient for a finding that a reasonable employee in Ms. Ned's position would have felt compelled to resign.  The only incident of discrimination to which plaintiff allegedly was exposed during her entire career is the product of one single event - the meeting with Ms. Comeaux on plaintiff's final day of employment.  By plaintiff's own testimony, she had a good working relationship with her co-workers and managers (even Ms. Comeaux prior to this one incident), had a successful long-term career with the Hospital, was well thought of by the administration and other employees, performed her work in an exceptional manner, and was named employee of the month and employee of the year.

As this is a motion for summary judgment, the Court accepts as true plaintiff's description of the meeting: plaintiff was given the option to retire or be fired for failing to perform work she was physically unable to perform, and this "work" (i.e., patient care) was ultimately transferred to a healthy-bodied person who took over plaintiff's job duties.  However, plaintiff resigned before she saw or worked with Ms. Comeaux again, and no other acts of discrimination are alleged to have occurred after this meeting.  Ms. Ned availed herself of no available avenue to discuss or pursue her position or request accommodation.  Rather, she left, and never returned to work, spurned all offers and attempts by the Hospital to address her situation and keep her within the Hospital in a fashion

her physical condition allowed. Under the facts alleged, the Court cannot say the Hospital made Ms. Ned's working conditions so intolerable she felt forced into involuntary resignation. Under these facts, the Court cannot know whether the Hospital and Ms. Ned might have reached some accommodation or remedial action for Ms. Comeaux's alleged actions, as Ms. Ned refused all attempts by the Hospital to address the issue and never returned to work.[29] Consequently, under these facts, Ms. Ned's claim of constructive discharge against the Hospital based on her race and sex in violation of Title VII, 42 U.S.C. § 1981, and La. R.S. 23:301 should fail as a matter of law.[30]

However, the Court need not base its decision on that determination alone, as this Court also finds plaintiff's claim fails because defendant has a legitimate, nondiscriminatory justification for requiring a change in plaintiff's job duties: in May of 2002, the Hospital hired Quorum Consulting, Inc. to develop a productivity plan for the Hospital which required employees to be more involved in direct patient care. Thus, on that finding, the burden shifts to plaintiff to demonstrate the Hospital's reason is either false or unworthy of credence and is merely a pretext for discrimination. In support of this burden, plaintiff argues:

> Clearly, if Plaintiff's version of events is believed, then there is sufficient evidence that would allow a fact finder to infer intentional discrimination. It is not disputed that Plaintiff did her job exceptionally well, and was highly qualified for that position. It is also undisputed that Cherisse Comeaux had no knowledge of the respiratory department, and as she admitted herself, certainly had no knowledge about how to manage it. She clearly needed Barbara Ned's knowledge and

---

[29] See e.g. Thompson v. Naphcare, Inc., 117 Fed. Appx. 317, 325 (5th Cir. 2004) (five instances of sexual harassment were insufficient to create an intolerable working environment such that an employee felt compelled to resign where employer took prompt remedial action; plaintiff did not allege the discriminatory behavior continued after the employer's investigation, and "an employee who resigns without affording the employer a reasonable opportunity to address her concerns has not been constructively discharged.")

[30] As the Court finds plaintiff has failed to carry the third element of her prima facie burden, the Court need not examine the fourth element – whether or not she was replaced by someone outside the protected class.

experience in order to successfully run the department. Thus, it make no sense for the plaintiff to be given the option of demotion or retirement. Clearly there is some other explanation for the treatment of Mrs. Ned. Based on the circumstances, including the undisputed fact that Plaintiff is of African-American heritage, and was of somewhat advanced age at the time of the events, if Plaintiff's version of events is credited, then a jury could certainly infer the intentional discrimination was the basis for Ms. Ned's treatment at Opelousas General Hospital. Plaintiff has provided sufficient evidence for a fact finder to conclude that the Hospital's productivity plan was a pretext to allow it to unlawfully discriminate against her. Given the evidence presented by Plaintiff, summary judgment should be denied. [Doc. 22, pp. 19-20]

The Court finds plaintiff's argument too speculative to demonstrate that the Hospital's productivity plan was a pretext for discrimination. By all accounts, the plan seemed to affect all employees, regardless of age, race, sex or disability. As noted by the Fifth Circuit, *"Title VII ... do[es] not protect against unfair business decisions[,] only against decisions motivated by unlawful animus,"*[31] (emphasis added) and instructs courts they should hesitate before interfering with an employer's business decisions.[32] The Court finds plaintiff's argument that the Hospital's proffered reason is merely a pretext for discrimination to be unsubstantiated and only conclusory in nature and thus not sufficient under the law to carry her burden, particularly in light of the time and expenditure put forth by the Hospital to develop a productivity plan, its bringing in an outside source to guide that work, the far reaching effect of this plan, and the fact the plan affected all employees. The Court finds the productivity plan implemented by the Hospital to be a legitimate, nondiscriminatory reason for its actions with regard to Ms. Ned. As previously stated, plaintiff's burden is not satisfied with "some metaphysical data as to the material facts," by "conclusory allegations," by "unsubstantiated assertions," or by only a "scintilla" of evidence. "... [S]ummary judgment is inappropriate in any

---

[31] Turner v. Texas Instruments, Inc., 555 F.2d 1251, 1257 (5th Cir. 1997) (overruled on other grounds by Burdine v. Texas Dept. of Community Affairs, 647 F.2d 513 (5th Cir. 1981)).

[32] See e.g. Odom v. Frank, 3 F.3d 839, 847 (5th Cir. 1993).

case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a

judgement in favor of the nonmovant.'" Little, supra. Finally, the Court notes Title VII requires the

unlawful employment practice must be due to an individual's race, color, sex, or national origin. See

42 U.S.C. § 2000e-2.   Here, accepting Ms. Ned's version of events as true, nothing said at the

meeting between Ms. Ned and Ms. Comeaux involved Ms. Ned's race or gender, and the Court

cannot stretch the facts presented to find such discrimination.  Due to the foregoing, the Court

GRANTS defendant's Motion for Summary Judgment and dismisses all of plaintiff's claims based

on unlawful gender and race discrimination with prejudice.

## C.  Age Discrimination in Employment Act, La. R.S. 23:301, and La. R.S. 51:2231

Under the ADEA, "It shall be unlawful for an employer... to discharge any individual or

otherwise discriminate against any individual with respect to his compensation, terms, conditions,

or privileges of employment, because of such individual's age... ."  29 U.S.C. § 623(a)(1).   As

previously noted, the same evidentiary procedure used in Title VII cases for allocating burdens of

production and proof applies to claims of discrimination under the ADEA.  Brown v. Bunge Corp.,

207 F.3d 776, 781 (5th Cir. 2000); see also n. 1.  Therefore, in this matter, the Court will use the

McDonnell Douglas framework for analysis of plaintiff's age discrimination claims.  See Section

III, B.

To establish a prima facie case of discrimination under the ADEA, a plaintiff must prove:

(1) that he is a member of a protected class; (2) he was qualified for the position that he held; (3) he

was discharged; and (4) he was either: (i) replaced by someone outside the protected class, (ii)

replaced by someone younger, or (iii) otherwise discharged because of his age. Armendariz v.

Pinkerton Tobacco Company, 58 F.3d 144, 149 (5th Cir. 1995); Brown at 781.[33]  As with a claim
brought pursuant to Title VII, in order to establish the third element of the prima facie burden, when
an employee resigns, he or she must prove constructive discharge, i.e., the employer deliberately
made plaintiff's working conditions so intolerable he was forced into an involuntary resignation.
See Brown at 782; see also Section III, B.

There is no dispute regarding the first element of plaintiff's prima facie case, as the Hospital
has stipulated plaintiff is over forty years of age.  Defendant has not addressed the second element
of plaintiff's prima facie burden - that she was qualified for the position she held - thus, the Court
presumes this fact is not in dispute.  With regard to the third element of plaintiff's prima facie claim,
defendant argues plaintiff is unable to prove constructive discharge for the same reasons provided
in Section III, B.[34]  Consequently, this Court finds, for the same reasons contained in Section III, B,
plaintiff has failed to carry her burden – i.e, (1) plaintiff has failed to show her working conditions
were so intolerable a reasonable employee would have felt compelled to resign; and (2) plaintiff has
failed to demonstrate defendant's legitimate, nondiscriminatory justification for a change in
plaintiff's job duties is false, unworthy of credence and/or merely a pretext for discrimination.  Due
to the foregoing, the Court GRANTS defendant's Motion for Summary Judgment and dismisses all
of plaintiff's claims based on age discrimination with prejudice.

---

[33] Other cases in the Firth Circuit state the third element of plaintiff's prima facie burden as: "he
suffered an adverse employment action."  See e.g., Cheatham v. Allstate Ins., Co., 2006 WL 2460910, n.
4 (5th Cir. 2006 ).  In the instant matter, plaintiff has asserted only a claim of constructive discharge.  As
such, the Court finds the third element, as listed above, to be more appropriate to the facts of this matter.

[34] The parties have argued all claims in the same sections of their brief and have provided only
very brief distinctions between each claim.

**D. Americans with Disabilities Act, La. R.S. 23:301, and La. R.S. 51:2231**

"The ADA is a federal anti-discrimination statute designed to remove barriers which prevent

qualified individuals with disabilities from enjoying the same employment opportunities that are

available to persons without disabilities." Taylor v. Principal Financial Group, Inc., 93 F.3d 155,

161 (5th Cir. 1996). The ADA prohibits discrimination in employment "against a qualified individual

with a disability because of the disability of such individual in regard to job application procedures,

the hiring, advancement, or discharge of employee, employee compensation, job training, and other

terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The act defines a qualified

individual with a disability as "an individual with a disability who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such individual

holds or desires." 42 U.S.C. § 12111(8). A disability under the act is defined as:

> (A) a physical or mental impairment that substantially limits one or more of the
> major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment. 42 U.S.C. § 12102(2).

"Discrimination" includes:

> Not making reasonable accommodations to the known physical or mental limitations
> of an otherwise qualified individual with a disability who is an applicant or
> employee, unless such covered entity can demonstrate that the accommodation would
> impose an undue hardship on the operation of the business of such covered entity.

42 U.S.C. §12112(c)(5)(A).

The ADA defines "Qualified Individual" and "Reasonable Accommodation" as follows:

(8) Qualified individual with a disability

> The term "qualified individual with a disability" means an individual with a disability
> who, with or without reasonable accommodation, can perform the essential functions
> of the employment position that such individual holds or desires. For the purposes
> of this subchapter, consideration shall be given to the employer's judgment as to

what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

(9) Reasonable accommodation

The term "reasonable accommodation" may include -

(B) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment of devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111.

The same analysis applies to claims of discrimination under the ADA as Title VII and the ADEA; proof via circumstantial evidence is assembled using the framework set forth in McDonnell Douglas. Taylor at 162. To make a prima facie showing of discrimination under the ADA, plaintiff must establish: (1) she is disabled or is regarded as disabled; (2) she is qualified for the job; (3) she was subjected to an adverse employment action on account of her disability; and (4) she was replaced by or treated less favorably than non-disabled employees. Gowesky v. Singing River Hosp. Systems, 321 F.3d 503, 511 (5th Cir. 2003). The standard for a claim of constructive discharge under the ADA is the same for a claim under Title VII and the ADEA: plaintiff must demonstrate the employer deliberately made her working conditions so intolerable that she was forced into involuntary resignation. See e.g. Landgraf v. USI Film Products, 968 F.2d 427, 429 (5th Cir. 1992).

In the instant matter, plaintiff asserts she is disabled under the first and third prongs, that is, she has a "physical or mental impairment that substantially limits one or more major life activities," and that she was "regarded as" having such an impairment by her employer. Defendant assumes,

for purposes of this motion only, plaintiff can prove she is a qualified individual with a disability.[35]

Again, the parties make the same arguments set forth in Section III, B and C: whether or not plaintiff

has stated sufficient facts to satisfy the third element of her prima facie burden (adverse employment

action via constructive discharge.)  Consequently, this Court finds, for the same reasons cited in

Section III, B, plaintiff has failed to carry her burden – i.e., (1) plaintiff has failed to show her

working conditions were so intolerable a reasonable employee would have felt compelled to resign;

and (2) plaintiff has failed to demonstrate defendant's legitimate, nondiscriminatory justification for

a change in plaintiff's job duties is false, unworthy of credence and/or merely a pretext for

discrimination.

Additionally, plaintiff has not presented sufficient evidence to create a genuine issue of

material fact as to whether the Hospital violated the ADA by not making reasonable

accommodations to a physical limitation suffered by plaintiff and known to defendant as required

under the Act.  See e.g. Taylor at 163.  The only evidence plaintiff has put forth to show her

employer denied her a reasonable accommodation is plaintiff's testimony that at the meeting with

Ms. Comeaux, she was told her only options were to retire or work the new schedule as presented.

However, by plaintiff's own account, the nearest she came to making a request for a reasonable

accommodation was by saying she could not work the position as presented to her by Ms. Comeaux.

Plaintiff attempts to circumvent her requirement under the ADA to request a reasonable

accommodation by arguing her former supervisor (Mike Mullins, who also resigned when asked to

perform more direct patient care) had accommodated her disabilities and therefore, she did not need

---

[35] As defendant has stipulated to this fact, it is not considered by the Court.  However, the Court notes, from the evidence presented before it thus far, plaintiff has failed to sufficiently develop for the Court how her disability impairs her ability to perform the essential functions of her employment position.

to make a request for reasonable accommodation following the meeting with Ms. Comeaux.  The
Court finds this argument unpersuasive.  While employers have an obligation to participate in an
interactive process with an employee to develop a reasonable accommodation, the process requires
the cooperation of the employee.  Loulseged v. Akzo Nobel, Inc., 178 F.3d 731, 735 (5th Cir. 1999).
*"Once an employee has made a request for an accommodation,* the ADA's regulations state 'it may
be necessary for the [employer] to initiate an informal, interactive process with the qualified
individual with the disability in need of the accommodation' in order to craft a reasonable
accommodation."  Id. (citing 29 C.F.R. § 1630.2(o)(3)).  The EEOC's guidelines stress that the
interactive process requires the input of the employee as well as the employer.  Id., (emphasis added)
citing 29 C.F.R. Pt. 1630, App. §1630.9 at 359.  The duty to launch the interactive process is
triggered by the request for an accommodation.  Taylor v. Principal Financial Group, supra.  The
need for bilateral discussion arises because "each party holds information the other does not have
or cannot easily obtain." Loulseged (quoting Taylor v. Phoenixville School District, 174 F.3d 142,
162 (3rd Cir. 1999) (noting that employers will not always understand what the disabled employee
is capable of and the employee will not always understand what accommodations are reasonably
available)).  Furthermore, employers cannot be expected to anticipate all problems that a disability
may create on the job and spontaneously accommodate them.  Loulseged, n. 4.  Accordingly, the
burden is on the employee to request an accommodation.  Id.  Courts consistently hold an employer
cannot be found to have violated the ADA when responsibility for the breakdown of the "informal,
interactive process" is traceable to the employee and not the employer.  Id.  Here, plaintiff was no
longer working under Mr. Mullins, a full re-organization was under way, causing assignment of new
work duties to many, including Ms. Ned.  Thus, neither the Hospital nor Ms. Comeaux at that

juncture could have had an idea as to what accommodations Mr. Mullins had made for plaintiff. What the new duties envisioned for Ms. Ned actually would have entailed, whether Ms. Ned's condition could have supported those duties and what, if any, accommodation Ms. Ned might have required will never be known. Ms. Ned left the Hospital and spurned any offers from the Hospital thereafter. The Court finds a reasonable employee, when presented with a new manager who asked plaintiff to do more direct patient care (consistent with her job description) which plaintiff felt she could not do, could have made a request for a reasonable accommodation from the new manager, or the supervisor overseeing that manager.

Of further import, by all accounts, plaintiff had a good working relationship with Bob Hardy, Vice-President of Support Services. However, she never requested an accommodation from the Hospital through this readily available avenue nor attempted to work out a reasonable accommodation with him or any other person associated with the hospital. By all accounts, and plaintiff does not dispute, she was asked on multiple occasions by Mr. Barrow after the meeting with Ms. Comeaux if a reasonable accommodation could be worked out, or if plaintiff would be willing to work in another, less physically demanding position such as public relations. However, plaintiff was adamant she wanted to retire. As stated in Loulseged, "One cannot negotiate with a brick wall." Id. at 737.

The Court finds under the facts presented, plaintiff has failed to show her employer deliberately made her working conditions so intolerable plaintiff was forced into involuntary resignation. Taking plaintiff's allegations as true, she had been told on one occasion by Ms. Comeaux that she would be required to work longer hours and do floor work or retire or be fired. Ms. Ned's decision to terminate her employment and spurn all discussion with the Hospital, deprives

the parties and this Court of the chance to know what further consultations the Hospital might have produced, just as it deprives this Court of the opportunity to know exactly what accommodations would ultimately have been provided.  As stated by the Fifth Circuit:

> Nothing was clearly final or settled. [Plaintiff] could have simply waited a few days to see whether further proposals or discussions developed.  She also could have at several points vocalized her concerns – thus participating in the informal interactive process – and in the process given [defendant] a chance to correct her misperception that further discussion was futile. Instead, she chose to quit.  The fact that [plaintiff] may have unreasonably believed the process had terminated ... is irrelevant.  In light of these undisputed facts, no reasonable jury could find that responsibility for the failure of the process to reasonably accommodate [plaintiff] rested with anyone but herself.  <u>Loulseged</u> at 740.

The reasoning in <u>Loulseged</u> is directly applicable to this matter.  No reasonable jury could find the responsibility for the failure to reasonably accommodate any disability of plaintiff rests with anyone but Ms. Ned.  Ms. Ned's choice to terminate her employment due to this one incident with her new manager was not reasonable, and no reasonable jury could find Ms. Ned's working conditions had become so intolerable she was forced to resign, as no one can know what her job duties might have been due to Ms. Ned's actions.  As such, defendant's Motion for Summary Judgment seeking dismissal with prejudice of plaintiff's claim for unlawful disability discrimination is GRANTED.

## IV.  CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment [Doc. 16] filed on behalf of Opelousas General Hospital is GRANTED in its entirety.

Lafayette, Louisiana, this ___2 6___ day of ___March___, 2007.

_____
REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

Page -30-